Mr. Saverin. Thank you, Your Honor. It pleases the Court, my name is Philip Saverin and I represent Ironshore Indemnity in this appeal. So, there are two issues to be determined by the Court in this appeal. One is whether there was a fraudulent instruction, and that's a defined term in quotations in the policy, that directed a bank to transfer funds. And then the second one is, if so, whether or not the loss claimed by the insured, which resulted directly from such a fraudulent transfer. We maintain that there was neither. Fraudulent instruction is defined in specific ways under the policy. The definition issue in this case concerns what's called a spoofed email or it's a phishing scheme where someone sent an email purporting to be from Mr. Nazarian, who was the owner of the company, to the controller, a woman named LoAnne Leach, telling her that there was a purchase coming up and that she needed to work with an outside attorney named Mark Leach in order to accomplish that. There then were some communications between Mr. Leach and Ms. Leach. Mr. Leach was not purporting to be an employee or associate in any way with the insured. In fact, he was outside counsel. So there were emails, there were phone calls, and then subsequently to that, Ms. Lean received an email from Mr. Leach that contained directions to the bank. We maintain that that was not a fraudulent instruction because Mr. Leach was not purporting to be an employee of principle. And likewise, the first communication, although it fell within the definition, the third definition of a fraudulent instruction, was not to direct the bank to do anything. It was a communication to work with outside counsel to effect the transfer. When we have this second one, the second communication, which is from Mr. Leach with the directions of the bank that contained very specific wire instructions, even after that, there are several intervening acts. There is the logging into the website, the account on the bank, but then the bank freezes the funds, and I think that's very significant because it was flagged by the bank's fraud department, at which point there were communications between the fraud officer at the bank and Ms. Lean. There was also another communication with Mr. Leach at the bank's request. Ms. Lean reached out to Mr. Leach, in fact, telephoned him, or he telephoned her, rather, after she sent an email, in order to satisfy the bank that the wire transfer was not fraudulent. It was only then that the fraudulent transfer went through. So, as far as the first question that we believe is at issue in this case, there was no fraudulent instruction, as that term is defined by the policy, directing a bank to transfer funds. Let me ask you, on the second email that was sent, it was addressed to Loanne, here are the remittance details as requested by Josh, now that's Josh Nassarian, right? Yes, it is. For today's wire, and then it gives the instructions, and that wire was sent, right? It was sent after a number of intervening acts that I just described. Right, but the fact that there are some internal processes by Wells Fargo, as well as by the company, does that break the chain of being direct? Yes, it does, and the reason that we say that it does is because a direct, all the cases that we've cited, from the 11th Circuit in the Incom case, the 6th Circuit in the American Circuit in the Apache case, the 9th Circuit in both the Pestmaster and the Taylor case, they all say that in order for there to be a direct loss, there has to be no intervening acts. It has to be inevitable. The American Tooling case described it as the point of no return. So, your argument would be that if Lynn had, if he gave the instructions, Josh initially, to Lynn, and she gives it to somebody else in the company who does the thing with the bank, that's an intervening act? The intervening act is when the bank throws the funds, and when there were communications with Mr. Leach. No, no, I'm sorry. That's not my question. I apologize. Let's suppose that Josh tells Lynn, make this transfer, and Lynn turns around and has somebody in the firm contact the bank. Is that an intervening act? No. No. That would be direct, because at that point, it's inevitable, the point of no return is when... Well, then the question is, when Josh confirmed the transaction later on, there had already been an intervening act, is what your argument is? There had been, yes. There had been an intervening act. Which broke the chain of causation. Yes, yes. It's a causation issue, isn't it? No. It's two things. The first one is whether or not there's a fraudulent instruction directed to the bank. Well, I understand it, but then it becomes a causation issue. Assuming that, assuming you have that, then the question is... Assuming the instruction. Assuming the fraudulent instruction directed to the bank, yes. Then you have the question of whether or not the loss was caused directly by that fraudulent instruction directed to the bank. And our position, and I think it's clear, but I just want to be extra clear, our position is that there was not a fraudulent instruction directed to the bank to transfer funds because the direction to the bank came through Mr. Leach, who was not impersonating at that point someone who was an employee of principle. So our first position is that there was not the fraudulent instruction directed to the bank to transfer funds, but then secondarily, that even if there were, that these intervening acts broke that chain. And I might point out the district court, in its opinion, said that the two scenarios that it saw were intervening acts, as the plaintiffs indicated, or as we indicated, there had to be a direct loss. And so under the district court's own reasoning of the plaintiff's argument, the intervening acts, the court found that there was a fraud and there was a loss, and therefore causation. And we think that that is a gross misinterpretation. Let me ask you this, this whole thing from the start to the finish was, what, within two hours? Yes, Your Honor. I mean, that sounds reasonably direct, as opposed to something that stretched over days and days. I don't think it's a temporal, I don't think that's a temporal issue, because you could have a direct loss. For example, if the imposter gave, hypothetically gave, wiring instructions to Ms. Lean, and she handled it the next day, we'd still have a direct loss. By the same account, especially with the way emails are these days, with rapid communications, we can have many intervening events in a very short period of time. So I don't think that the question is how long it took for the acts to intervene, but whether or not... Nazarian's email was a fraudulent instruction, wasn't it? I'm sorry? Nazarian's email was a fraudulent instruction. The first one was. It fell within the definition. So if then, if the Leach one just supplements that... If she had taken that, if that first instruction contained the directions to the bank, and she had logged on to the bank, and had transferred the funds without anything else, I think that's what this policy covers, and if that's what the American tooling facts are, it's also what the metadata facts are. Your problem is that Leach got involved, is that it? Yes. That's what broke it, Leach's involvement. It broke the chain, and also it prevented it from being a fraudulent instruction with the wire instructions, because Mr. Leach was not purporting to be an employee of principle when he sent the wire instructions. There's an old baseball term, Tinker to Evans to Chance, which was short, second to first. The Chicago Cubs, back about 1905, the double play. Yes. That doesn't work here. Right. In your argument. Is that it? Yes. In a... What do you make of the fact that I understand that the Surety and Fidelity Association of America did a filing with the Department of Insurance, right, and they gave a fact scenario that they wanted to clarify that this didn't cover, was the exact same situation we've got here. Is that true? Yes. If I... I'm going to go over my 30 seconds, but if I could answer that question. Go ahead. Okay. Thank you for bringing that up, Judge Gilman. What the Surety and Fidelity Association said, which actually I think is favorable to our insurer's position here, is that this is a new crime, this type of crime that happened in this case that was not contemplated by this Form 0041. And so they were going to create a new form, 0167, that changed, created a new definition, a new term called fraudulently induced transfer, and it defined it as a transfer resulting from an instruction, I'm sorry, a payment order made on the good faith reliance of the instruction provided by a person impersonating an employee, customer, vendor, or owner of the insured. So what the Surety and Fidelity Association is saying is that we need to create a new definition in order to cover this new crime. Then, when the court, I'm sorry, when the Surety and Fidelity Association says that we're going to remove this definition, this third definition of fraudulent instruction, because now it's subsumed within the new term of fraudulently induced transfer, the issue that the plaintiff has brought up is really a red herring because what the language that they're talking about has to do with the first and the second definitions of fraudulent instruction, and that is because they removed the third definition of fraudulent instruction from the form, put that into this new form for fraudulently induced transfer. The last paragraph of the Surety and Fidelity Association submission talks about the definition of a payment order, and if you were to look at the actual form, which is found in the record at document 39-2, pages 14 and 15 in the district court record, that language is for the remaining first two definitions of fraudulent instruction in order to tighten that up. It has nothing at all to do with the third definition of fraudulent instruction that is in this case. Right. I gather you would agree, though, with the Georgia law is the insurance contract must be construed in accordance with the reasonable expectations of the insured. Is that accurate? No, I don't think that's accurate. I think it— Quoting directly from Georgia Farm Bureau Mutual v. Myers. I believe, Your Honor, that that's if there's a question of—if there's a finding of ambiguity, then you would go to those in order to resolve it. And I might point out that the Citizens Trust case, which is a Georgia case, said that directly is not ambiguous, and I realize I'm past my time. I'd like to reserve some for rebuttal, if I could. You're safe for rebuttal time. Thank you. Mr. Goates. May it please the Court, Your Honors. Good morning. I'm Scott Goates on behalf of PSG, the appellee. I'm joined by Jim Leonard, my partner, and also Joe Ventura, who was a managing director of Principal Solutions Group. Your Honors, consistent with appellant's analysis of the case, there are two key issues. Was there a fraudulent instruction, as that term is defined within the insurance policy, and did the loss result directly from a fraudulent instruction? The answer, as the district court found twice, is yes. There was a fraudulent instruction, which Ironshore itself has admitted that there may have been in its briefs, and the loss, which took place in about two hours, did result directly from the fraudulent instruction. And so, looking to the definition of fraudulent instruction that Ironshore wrote in this contract of adhesion, it talks about, it includes a computer, telephone, or other written or electronic instruction initially received by you, by PSG, which instruction purports to have been issued by an employee, but was in fact fraudulently issued by somebody else. And as the court has explained, the initial message from the fake Mr. Nazarian says, wire money, and that there is full approval to execute. I admit that that email is a fraudulent instruction. The only real question is, what do we do about what Leach did afterward? And it seemed to me that that just supplemented the instruction that had already been made and flowed directly from it. Your Honor, we agree 100%, and consistent with that, and as documents that are mentioned within appellant's briefs, in each message that comes from the fraudster, to continue to persuade the employee that this is an appropriate thing to do, it mentions that he's operating at the instruction of Mr. Nazarian, the managing director. Yeah, all of it's triggered by the Nazarian email, which they admit is a fraudulent instruction. That's exactly right. We agree. And there's no new intervening cause. That would be a different reason for the wire to be made. Every time is because, quote, Mr. Nazarian had approved the wire transfer, as stated on the telephone in the record of the appellant's brief at 10. They mention it again at page 12 that Mr. Leach told the controller, quote, to tell the bank that he had received the instructions verbally from Nazarian via telephone. That's in their brief at 12. And so the suggestion that because the original email did not include wire instructions is a point that's not included in the insurance policy. Georgia law is clear that when you could have included more stringent language in the insurance policy, you're not able to interpret the language that you actually wrote in the more stringent fashion. And so there are cases out there, for example, in the Crown Bank case, which is pending in New Jersey, that talk about more stringent ways to interpret this. And so all of these instructions— I mean, all Leach is really doing is providing the details to effectuate Nazarian's fraudulent instruction. That's exactly right. We agree with that, Your Honor. The extrinsic evidence that Judge Gilman raised is consistent with this point. The district court reviewed what Iron Shores Association said as the industry is rolling out a new policy with language that they purport to have more explicitly cover this sort of loss. And the reason that they needed that, they explained, is to, quote, avoid any misinterpretation, end quote, and avoid confusion as to whether, quote, it covers the same exposure, end quote, as new language is being sold. So what they've told the public and insurance commissioners is that we want to cover social engineering fraud. We need to get rid of the definition that's at issue in this case to avoid misinterpretation that the old language covers. And they admit that instruction in the prior version could refer to either an instruction received from some party to the insured or an instruction sent by the insured to the bank to wire funds. A suggestion that this language could be read in more than one way, which on Relief versus Mercury Insurance and St. Paul versus FDIC is an admission that the language is ambiguous because it can be read in more than one way. So then the question becomes, was their loss resulting directly from this fraudulent instruction, whether it be from the original email or from the messages from Mr. Leach, which completely continued of steam and at the direction of Mr. Nazarian. And the answer we submit is yes for three points. First, it's immediate. It took place probably within about an hour, about the same amount of time that we arrived at this court, about the time that I'm speaking, the money was gone. Between 9, 10 a.m. and 11, 21 a.m. on a Wednesday morning, July 8, 2015. The cases on point are consistent with this. Under the Incom decision, a panel of this court, it's unpublished decision, looked to the question of what direct and directly means, and they looked at the concepts of immediacy without interruption. And they held for purposes of that policy, one thing results directly from another, if it follows straightaway, immediately, without intervention or interruption. The facts for Incom, however, were completely different from those that are here. There were 25,553 transactions that took place over seven months. And the court explained it was a four-step process. The first one was the initial computer fraud. The second step was sending money to an intermediary third party. Incom argued that its loss took place at step number two. The court said no, it did not. There had to be a third step. Fraudulent charges were made in the debit cards. And then the final and fourth step, when the money was actually gone, is when the loss to Incom occurred. And the court explained that step four, quote, was temporarily remote, days or weeks, even months or years, end quote, between that fraudulent transaction and when the loss took place. And indeed, the court explained that Incom had, three years later, over a million dollars in its account because it was able to stop some of these transactions. And it rejected this assertion that the money was gone at step two. This is completely different. This was a two-step process. Fraudulent instructions, step one, satisfying that definition. And step two, the money is gone. The money is wired. There's no chance to get it back. Consistent with that is the published decision from American Tooling from the Sixth Circuit that came out this year. American Tooling involved another business email compromise and spoofing situation in which the fraudster sent multiple emails starting on March 27, 2015. And then there were multiple wires sent all the way through May 8, 2015, unlike the two-hour window that was at issue here. The Sixth Circuit explained that there was a, quote, chain of events, end quote, to actually send the wires. There were multiple emails that were received. There was a decision from a vice president determining whether the vendor had actually satisfied the work or not. The vice president had to determine which invoices to pay, then had to sign into the banking portal, enter the information, and then someone else had to approve the wire. Notwithstanding that, quote, chain of events, the American Tooling panel explained that American Tooling had, quote, suffered its loss immediately after the transfer, end quote. And they also explained how that case was different from Incom. Walking through it, they explained that in Incom there was the four-step process, whereas in American Tooling there were two steps. Consistent with both of those is the metadata decision, the unpublished decision from the Second Circuit. Metadata, factually, is quite opposite because the series of emails and the facts as they unfolded were virtually identical to here. In metadata, there was an original email saying, send money, you'll hear from our attorney who will contact you. And the fake attorney did indeed contact the company. The fraudster actually had to take things a step further in metadata because the internal employee was not allowed to wire the funds without further approval. And so the fraudster sent more emails around the company to other people and said, you'll be hearing from the original employee posing as another employee, please work with her to wire the funds, to paraphrase, if you will. And so the insurance carrier made the exact arguments that Ironshore has made here. As the trial court explained in metadata, according to federal, federal insurance, the insurance carrier, the spoofed emails, quote, did not create, authorize, or release a wire transfer, end quote, because metadata employees received telephone calls from the thief and took other steps in approving the fraudulent transfer. Notwithstanding that, the district court said that it's covered under fraudulent transfer coverage, it's covered under computer fraud coverage. The Second Circuit upheld on computer fraud, said we need not address fraudulent transfer coverage, one series of coverage is enough. And it said while it's true, the Second Circuit, while it's true that metadata employees themselves had to take action to effectuate the transfer, we do not see their actions as sufficient to sever the causal relationship between the spoofing attack and the losses incurred. The employees, as this court has recognized, the employees were acting, they believe, at the behest of a high-ranking member of metadata. And so, under that case law, and consistent with the California decision, state court decision in Victory Networks, where again, there is an attorney involved, a fake attorney involved, and the court said we're denying the demur, we're not going to grant the motion to dismiss because there's an opportunity for coverage here. Consistent with those cases is actually the language in the policy. Ironshore has said the loss is not direct, but there are two provisions in the policy that address indirect loss and what an employee actually can do. Indirect loss is defined as a bookkeeping loss or an unrealized income of you expected to get money, you did not. Indirect loss is also considered to be damages to third parties or third party liability. That's consistent with, conceptually, what the Sixth Circuit said in the earlier tooling manufacturing decision, in which it walked through the historical analysis of how direct versus indirect and loss resulting directly came about, where they recognized that loss resulting directly was an effort by the insurance industry to avoid covering third party liability. And so, Ironshore wrote that right into the policy. The third thing that's indirect is whether there were fees paid to establish the amount of the loss. And so, if Ironshore is telling us what indirect loss is, aren't they recognizing that direct loss encompasses things beyond that? This is not a third party liability. This is not bookkeeping losses alone. This was a million seven that was wired by mistake due to fraud. I'm just curious, by the way, was this part of the normal course of business of principle? I mean, you know, just you get an email from the boss, allegedly, you know, fraudulently saying, hey, send a million seven to a Chinese bank, and you're going to get a call from a lawyer you don't know who will carry out, give you the wiring instructions. I mean, was this bookkeeper, Lien, thinking, oh, this is just normal? Well, Ms. Lien acted, she was being a good employee, I submit, in that she was acting at behest of her boss. She hadn't recognized that the email was being spoofed. Certainly not, they were not in the process of expanding quite often. They were a startup company. They were a fast-growing company in the state of Georgia, run by two managing directors, one of whom is here today. And as they were doing their business, it was not a big corporate environment, as you might expect. And so for situations like that, where somebody makes a mistake, somebody is defrauded, somebody is duped, that's exactly why one buys insurance. And these things happen. It's unfortunate that they did. We would all be happier if the money had not been sent. That's why there's a market for the insurance. Agreed 100%, Your Honor. And that's what the policy was designed to do. And so the last point in terms of the policy language is that Section 4D is an exclusion that has an exception.  What this policy language demonstrates is that Ironshore anticipated that employees in a bank would act upon fraud. They said, we won't cover losses from an employee or a bank, quote, acting upon any instruction, end quote, to transfer or pay money when that instruction actually turned out to be fraudulent, except under A.6.A.2, the exact provision that we're dealing with here. And so the policy recognizes that employees can be duped, that a bank can be duped, and they can take action upon that. And so now, consistent with that, we submit that because they did, there's coverage, it's recognized, and Ironshore's position ignores that. The last decision we note, and these were all decisions that came down after the briefing, was the Ubiquity Network's decision. Again, this is $46 million wired to foreign bank accounts, demonstrating the importance of this, and the same arguments arose there as well. The carrier said, it's not covered, it's not direct. The carrier said, well, they were messaged from an attorney, and so therefore, that's not a fraudulent instruction. And in rejecting the demurrer, the California state court judge said that ultimately, that's not accurate. And so, your honors, we submit that the district court got it right. It got it right twice. There was a fraudulent instruction, as Ironshore seems to admit, there's at least one. The employee thought she was doing the right thing. She acted consistently with that original message, and the directions that everything else was at the direction of Mr. Nazarian. And that the loss, which took place in two hours and ten minutes, on a Wednesday morning, did indeed result directly under both the policy language, how the INCOM panel interpreted the timing questions other courts have interpreted, and how things have unfolded. If there are no further questions, thank you. Mr. Sabret. Thank you. All right. I wanted to clarify that, I think this is clear, but again, just to make sure. The first communication, the first email, we admit was a fraudulent instruction. However, we do not admit and do not believe that it was a fraudulent instruction that fell within the grant of coverage. Because the grant of coverage is for a fraudulent instruction directing the bank to transfer funds. So, our position is that... It absolutely does that. It tells them that they're going to get more details about how to effectuate that. But it absolutely tells them you need to wire those funds. But it is not a direction to the bank, Your Honor. So, therefore, our position is that it does not fall within, it is not a fraudulent instruction falling within the grant of coverage. I just want to be clear that that's... Your argument is that the outside person, posing as Josh, has to give the instruction to the bank? No. Straight away? No. Has to give instructions to the employee that are directing the bank. In other words, the second... I understand the point. I thought you were changing things. No, no. The second, in other words, the second email, that had come from someone purporting or impersonating Mr. Nazarian, then the question would be solely whether or not it was a loss caused directly by that. I wanted to point out also that the exclusion that Mr. Goddess referred to, it says that it does not cover acts by employees acting upon an instruction that proves to be fraudulent. And then it says, except for A6A2, but it also says A6B. And that's important, because those are the only places where the fraudulent instruction in quotations, the defined term, is used. And so in those situations, where there's an instruction that turns out to be fraudulent, what the exclusion is making clear is that in those cases, the exclusion would not apply. And that is significant that it mentions both of them for this reason. And that is that the grant of coverage under A6B, which is for computer fraud, is broader. It says that it covers computer fraud based on an employee, quote, acting in good faith upon a, quote, fraudulent instruction, close quote. You don't have that in the funds transfer fraud grant of coverage that we have here. The word loss resulting directly, those three words, have meaning, particularly the word directly. And all the cases— I'll tell you what it tells me, approximately caused by. No, it cannot be approximately caused by, because then it would be— It's a causation word. It is a causation word. Okay. However, all the—let me get my notes here. Your argument has to be the sole cause. It has to be the direct cause. And what the cases— Well, I understand that, but does it have to be the sole cause? I just found my list. It has to be the direct. The income case, the panel of this court said, without any intervention or interruption, the FDIC versus— That fits in the sole cause. Yeah, but that, I mean, all that does beg the question whether this is an intervening cause. And that, too, is an inquiry that's about proximate cause. Well, the— I mean, because if there's an intervening event, then there's not a proximate cause. There's a difference between, we would say, between an intervening cause that breaks the chain. So, for example, if there's something that is foreseeable, if an intervening event, such as the bank questioning, is foreseeable, we might have approximate cause. But I want to point out that the Pestmaster case talks about it being inevitable. The American tooling case talks about it being a point of no return. There is no case, Your Honors, that says that they found direct loss on these facts. The metadata case, the American tooling case, all those involved a communication to the employee who then wired the funds. There's nothing intervening there. And I want to point out that district court, again, agreed with the principle because they said, the district court said, that the policy covers even if there were intervening events between the fraud and the loss. And I think that is categorically against the case law. So there's other things I would say, but I would rely on my briefs for those. Thank you. Thank you. We'll move to the last case.